FRATELLI GARDINO, S.p.A., Plaintiff,

v.

CARIBBEAN LUMBER COMPANY, INC., Defendant.

No. CV474–138.

United States District Court,
S. D. Georgia,
Savannah Division.

March 28, 1978.

Arnold C. Young, Hunter, Houlihan, Maclean, Exley, Dunn & Connerat, Savannah, Ga., for plaintiff.

Charles Rippin, Adams, Adams, Brennan & Gardner, Savannah, Ga., for defendant.

## ORDER ON DEFENDANT'S MOTION FOR NEW TRIAL AND JUDGMENT NOTWITHSTANDING THE VERDICT

LAWRENCE, District Judge.

Fratelli Gardino, an Italian corporation, filed suit in this Court against Caribbean Lumber Company, a Connecticut corporation, on July 8, 1974. The complaint alleged that the defendant breached a contract for the sale of 525,000 board feet of lumber and that Caribbean did "wilfully, tortiously and in complete disregard for its obligations and duties failed to undertake, in good faith, efforts to secure cargo space for shipments"

of the lumber. Plaintiff sued to recover $72,533.52 in consequential damages,[1] $47,001.72 for loss of anticipated profits, $50,000 for loss of customers, $100,000 in exemplary damages, and for attorney's fees. At the close of the jury trial plaintiff amended the complaint to conform to the evidence, Rule 15(b), by claiming $150,765 as lost profits and consequential damages.

The jury returned a verdict for plaintiff for $150,765 as lost profits, $3,676 for loss of customers, and $24,000 as attorney's fees—a total of $178,441.

Defendant has moved for a judgment N.O.V. or a new trial on several grounds. A hearing was held on September 30, 1977. Both sides have filed briefs.

### I

The negotiations between plaintiff and defendant began on December 7, 1972, with defendant's offer to sell plaintiff up to 550 MBF of lumber. The offer was made "subject to availability of CTE[2] boats which presently have." (Defendant's Ex. 4). Plaintiff apparently placed its order for 525 MBF on December 21st. In a Confirmation of Sale dated December 27th, defendant agreed to sell plaintiff 525 MBF of Honduras Pine FAS Puerto Cortes, Honduras. The lumber was to be air-dried or kiln-dried at seller's option. The price was $170 per MBF for 400,000 feet of two inch lumber and $180 per MBF for 125,000 feet of two and one-half and three inch lumber. (Plaintiff's Ex. 76). A Confirmation of Sale dated January 29, 1973, which superseded the former one, provided that all lumber was to be kiln-dried and that the price would be increased $5 per MBF. Delivery was to be between January and June, 1973. (Plaintiff's Ex. 77). Paulo Gardino, one of plaintiff's managers, understood that there would be six shipments of approximately 90 MBF each. (T. 44).

---

1. The original complaint asked for $59,387.50 "as measured by the difference in contract price and the actual cost of cover." Plaintiff's first amendment corrected this "typographical error."

2. Compania Transatlantica Espanola, S.A. is the only shipping line serving Honduras and Genoa.

Plaintiff received one shipment of 15 MBF in May, 1973. (T. 49–50). Lumber prices throughout the world underwent dramatic increases in 1973.[3] (T. 51). In June, 1973, Mr. Gardino and James M. Davis, President of Caribbean Lumber Company, met in New York to renegotiate the original contract. (T. 52–53). A price increase of $67.50 per MBF was agreed upon. Delivery was to be completed by December, 1973, "subject to availability of CTE vessels." (T. 54; Plaintiff's Ex. 78).

Plaintiff received one other shipment of 46 MBF in November, 1973, leaving an undelivered shortage of approximately 463 MBF. Defendant cancelled the contract in December, 1973, "due inability to ship before end December as Gardino himself stipulated in contract." (Plaintiff's Ex. 64).

## II

One ground of defendant's motion is that plaintiff was permitted at the trial to introduce evidence of a conspiracy[4] without receiving leave of court to amend its complaint. The purported conspiracy involved the interrelationship of three corporations: Caribbean Lumber Company, Wood Products Corporation, and Industria Madeira del Norte (IMN). James M. Davis, President of Caribbean, testified that he is also President of Wood Products. (T. 9). He is a minority stockholder in both companies. (T. 11–12). The majority stockholders in both Caribbean and Wood Products are Mr. Davis and members of his family. IMN is a wholly owned subsidiary of Caribbean.

Both Caribbean and Wood Products purchase Honduran lumber from IMN for resale. (T. 347). Many Caribbean orders taken in 1972 for Italian ports were never shipped. Many Wood Products orders taken in 1973 for shipment in Italy were

shipped. By revealing evidence of this interrelationship and the shipment data, plaintiff endeavored to establish Caribbean's bad faith in not securing cargo space so as to refute defendant's defense of commercial impracticability as well as to show that the three companies acted in combination to that end.

Defendant contends that it was prejudiced by the last minute conversion of a breach of contract action into a tort action. According to counsel, Gardino is "brazenly [attempting] to smuggle into this complicated case an entirely new and different cause of action *on the eve of trial*." Defendant's Brief of January 31, 1977, pp. 2–3 (emphasis in original). As stated, the original complaint alleged "that Caribbean wilfully, tortiously and in complete disregard for its obligations and duties failed to undertake, in good faith, efforts to secure cargo space for shipments of Honduras Pine." Plaintiff avers that it caused actual monetary damage and loss of good will. Although the word *conspiracy* is not used in the complaint, it is clear that plaintiff was setting forth a tort claim in connection with the breach of contract. Such evidence was also relevant to the claim for attorney's fees and for punitive damages.

A complaint need not specify the details upon which a claim for relief is based. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80. Discovery has replaced the niceties of common law and code pleading. The Federal Rules "restrict the pleadings to the task of general notice-giving and invest the deposition-discovery process with a vital role in the preparation for trial." *Hickman v. Taylor*, 329 U.S. 495, 501, 67 S.Ct. 385, 388, 91 L.Ed. 451. Defendant's thirty-third interrogatory asked plaintiff to "State each and every fact and identify each document supporting Plaintiff's contention in Para-

---

3. Caribbean's FAS prices for orders of pine to Italy in 1972 ranged from $155 to $175 per MBF. The 1972 contracts were renegotiated in 1973 for price increases of $75 to $100 per MBF. (Plaintiff's Ex. 70). Wood Products' CIF prices for similar orders taken in 1973 range from $380 to $520 per MBF. (Plaintiff's Ex. 71). Subtracting $100 per MBF from the CIF price gives the FAS comparable. (T. 25).

4. "In all cases he who maliciously procures an injury to be done to another, whether it is an actionable wrong or a breach of contract, is a joint wrongdoer . . . ." Ga.Code Ann. § 105–1207. See generally *Wiley v. Georgia Power Company*, 134 Ga.App. 187, 190–92, 213 S.E.2d 550.

graph 8 of its complaint that 'defendant . . . failed to undertake, *in good faith,* efforts to secure cargo space for shipments of Honduras Pine.' (Emphasis added)." In its Answers filed on June 18, 1976, plaintiff Gardino stated:

> "There are no documents, because the defendant failed to confirm cargo space by written booking. The quoted language refers to the fact that Caribbean's subsidiary IMN apparently had no trouble whatsoever in booking cargo space for Caribbean's sister corporation Wood Products on short notice, coupled with Caribbean's refusal to pay dead freight if Gardino booked the space. This latter refusal clearly implies that Caribbean was unwilling to commit itself to delivering lumber on *any* basis."

That answer should clearly put defendant on notice that the interrelationship of the three companies would be an issue at trial.

Moreover, I limited plaintiff's use of the term conspiracy. Before trial, I instructed counsel not to refer to any conspiracy in the opening remarks. (T. 4; T. 8). Plaintiff's counsel appears to have adhered to this ruling. I can find no use of the term conspiracy before the jury in the transcript. As I recall, the term was used only once during the trial—in plaintiff's closing argument on damages. This reference was in compliance with my ruling that the conspiracy issue would be "confined to the question of punitive damages, of malice and oppression." (T. 473).

Evidence of the interrelationship was admissible under Rule 402 of the Federal Rules of Evidence. It tended to show that bad faith by Caribbean in failing to secure cargo space was more probable than not. Such evidence was also admissible to refute Caribbean's defense of commercial impracticability.

---

**5.** This finding is not inconsistent with a finding of bad faith on Caribbean's part that would authorize an award of attorney's fees. See Part IV, *infra.*

## III

■ Defendant also objects to the Court's charge on punitive damages. There was, however, some evidence to support a jury finding as to conspiracy. If the jury concluded that such existed, it was entitled to award punitive damages. Apparently it did not credit evidence of a conspiracy as it did not award punitive damages.[5] Because there was evidence that would have authorized such an award, a charge on punitive damages was proper. See *Clayton McLendon, Inc. v. Judge & Company, Inc.,* 142 Ga.App. 659, 236 S.E.2d 683.

The charge on punitive damages was not given until after the issue of liability was decided. The instruction stated: "To authorize the imposition of punitive damages, there must be in the defendant's actions, some element of malice, oppression, wantonness, willfulness, that means purposeful injury, willful or a conscious indifference by the defendant to the consequence of his actions." (T. 496). Recovery of punitive damages was limited to the conspiracy aspect: "in order to support a claim for punitive damages, there must be a combination who agreed to commit this wrong which I have described." (T. 496).

In any event, I fail to see how Caribbean was harmed by evidence of the interrelationship since no punitive damages were awarded. See *Tri-State Systems, Inc. v. McMickle,* 239 Ga. 155, 236 S.E.2d 82; *Rolan v. Rittenhouse,* 107 Ga.App. 769(3), 131 S.E.2d 112.

## IV

■ Defendant also alleges error in submitting the issue of attorney's fees to the jury. It is argued that attorney's fees should not be awarded in breach of contract actions. Defendant also contends that there was no evidence to support an award of $24,000.

Attorney's fees are permitted as an expense of litigation by statute in Georgia.[6]

---

**6.** "The expenses of litigation are not generally allowed as a part of the damages; but if the defendant has acted in bad faith, or has been stubbornly litigious, or has caused the plaintiff

They are distinct from punitive damages and may be awarded if defendant acts in bad faith regarding the transaction out of which the cause of action arose. *Williams v. Harris,* 207 Ga. 576, 63 S.E.2d 386. "Attorney's fees may be allowed in the computation of damages for breach of contract where the defendant has acted in bad faith and caused the plaintiff unnecessary trouble and expense." *Mendel v. Leader,* 136 Ga. 442(3), 71 S.E. 753. Most contract actions that have allowed attorney's fees involved an allegation of fraud or misrepresentation. See, *e. g., Tam v. Newsome,* 141 Ga.App. 76, 232 S.E.2d 613; *Thibadeau Company, Inc. v. McMillan,* 132 Ga.App. 842, 209 S.E.2d 236. However, attorney's fees have been authorized in breach of contract actions where no fraud or misrepresentation is alleged. See *Shen v. Bruce,* 113 Ga.App. 483, 148 S.E.2d 496. See also *Bowman v. Poole,* 212 Ga. 261, 91 S.E.2d 770. Even in the absence of evidence of a conspiracy, there was sufficient evidence to support a jury verdict of bad faith on Caribbean's part in failing to secure cargo space.[7]

In regard to attorney's fees, this Court charged that "[d]amages for attorney's fees are based on the reasonable value of the attorney's fees, of which you are the judge under all of the evidence in the case." (T. 495). This charge accords with Georgia law. See, *e. g., Bankers Health & Life Insurance Company v. Plumer,* 67 Ga.App. 720, 725, 21 S.E.2d 515.

Ralph Bowden, a partner of plaintiff's counsel, testified that the time records in this case showed partner time of 355.3 hours, associate time of 75.6 hours, and paralegal time of 30.5 hours. He also testified that his firm bills $50 per hour for partner time, $35 for associate time, and $20 for paralegal time. (T. 216–19; Plaintiff's Ex. 93). Out of pocket expenses were $1,463.44 (T. 219–21; Plaintiff's Ex. 94).[8] The total amount is reflected in the following breakdown:

| | | | | |
|---|---|---|---|---|
| Partner time: | 355.3 hours × $50 | = | $ | 17,765.00 |
| Associate time: | 75.6 hours × $35 | = | | 2,646.00 |
| Paralegal time: | 30.5 hours × $20 | = | | 610.00 |
| Expenses: | | | | 1,463.44 |
| Total | | | | $22,484.44 |

Owen H. Page, a Savannah attorney, testified that he believed the hourly rates quoted by Mr. Bowden to be reasonable rates in the community. (T. 231). The evidence submitted sustains the award of $24,000 in attorney's fees. See *Christopher v. Almond,* 177 Ga. 211, 169 S.E. 899; *Tam v. Newsome,* 141 Ga.App. 76, 232 S.E.2d 613, *supra*; *Bankers Health & Life Insurance Company v. Plumer,* 67 Ga.App. 720, 21 S.E.2d 515, *supra.*

### V

Defendant urges that the verdict was inconsistent in two respects. First, the verdict was based on the January contract price rather than the amended June price. Second, the jury's award for "Loss of profits as the result of breach of contract to deliver lumber" included lost profits and benefit of bargain loss.

The jury was authorized to use the January contract price in determining damages. Under the Uniform Commercial Code, "the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental

---

unnecessary trouble and expense, the jury may allow them." Ga.Code Ann. § 20–1404.

**7.** The charge distinguished conspiracy and bad faith. "[I]f the defendant has acted in bad faith in combining with others to break this contract, or in the manner in which the contract was breached, then and in that event the jury may allow damages in the way of attorney's fees." (T. 495). "Now, whether or not to award punitive damages or expenses of litigation and attorney's fees is up to you, but before you can award those two types of damages, you must heed my instructions with regard to the quantity and quality of proof necessary to support a claim that the contract in the manner stated was breached in bad faith and that in order to deter the defendant from repeating the trespass that he acted maliciously. . . ." (T. 497).

**8.** The exhibits were admitted without objection. (T. 221).

and consequential damages provided in this Article (109A–2—715), but less expenses saved in consequence of the seller's breach." Ga.Code Ann. § 109A–2—713. Although increased in June by $67.50 per MBF, the original contract price was $175 to $185 per MBF.

The parties are bound by an agreement to modify a contract. Ga.Code Ann. § 109A–2—209.[9]

After the modification Gardino was obligated to pay the amended price upon delivery of the lumber. See *United States for Use and Benefit of Crane Company v. Progressive Enterprises, Inc.,* 418 F.Supp. 662 (E.D., Va.). Plaintiff did, in fact, pay the modified price for the November delivery.

On the other hand, "[w]here the seller has broken the terms of the contract as to the time for delivery of the goods, an offer by the buyer to accept them and waive all damages for previous delays, on the express condition that the goods be delivered on a specified day, would be conditional only, and would not be binding on the buyer until compliance with the condition." *Bernhardt v. Federal Terra Cotta Co.,* 24 Ga.App. 635, 636, 101 S.E. 588. See also *Hardwood Lumber Company v. Adam & Steinbrugge,* 134 Ga. 821(6), 68 S.E. 725; *Georgia Creosoting Company v. McIntosh Land and Timber Company,* 23 Ga.App. 561(1), 99 S.E. 166. That reasoning is applicable to the price terms as well as to the time of delivery. It would be unreasonable to hold Gardino to a modified contract which Caribbean had breached. Apparently, the jury agreed.[10]

■ Defendant also objects that the amount returned by the jury as "Loss of profits" actually includes lost profits and "benefit of bargain loss." The buyer's remedy is the market-price contract-price differential plus consequential damages. Ga. Code Ann. § 109A–2—713. The $103,765 representing the market-price contract-

price differential and $47,000 representing consequential damages in the form of lost resale profits were simply combined in the category "Loss of profits." There is no error in combining the proper elements of damages.

### VI

■ Defendant contends that the evidence shows that shipment by CTE vessels was impossible or commercially impracticable; that there was no reasonable method of substitute shipment, and that defendant could not ship more lumber than it did. Plaintiff claims that defendant could have shipped all of the lumber on CTE vessels, on other vessels going to Italy, or by transshipment.

The jury answered the following questions in the "Special Verdict":

"1. Did the agreed method of transportation of the lumber to Genoa aboard CTE vessels become, without fault of Caribbean Lumber Company, impossible or commercially impracticable in respect to the delivery to Gardino of the lumber sold, in whole or part?

Answer 'yes' or 'no' __no__

"2. Was there a commercially reasonable substitute for transportation available to Caribbean by way of shipping the lumber to some other Mediterranean or European port for transshipment and delivery to Gardino aboard either CTE vessels or those of other shipping lines?

Answer 'yes' or 'no' __yes__

"3. In answering Question No. 1 did the jury find that Caribbean could and should have delivered to Gardino 100% of the undelivered lumber?

Answer 'yes' or 'no'. __yes__

"4. If the jury has found, under the evidence, that delivery was reasonably prac-

---

9. But see Ga.Code Ann. §§ 109A–1—203 and 109A–2—302 on good faith and unconscionable conduct.

10. Plaintiff's Ex. 88 showed the loss based on the original and on the amended price.

ticable either through CTE (or by another shipping line) of a part or portion of the undelivered lumber, specify below what percentage thereof could and should have been delivered to Gardino. _____%"

Under the finding as to question number 1, the jury was not required to answer question 4. Its answer to No. 1 is susceptible to two interpretations. It could have meant that shipment by CTE was not impossible or commercially impracticable. Or the jury could have found that Caribbean was at fault in creating the impossibility. In either event, the response to question No. 3 that Caribbean should have shipped 100% of Gardino's order rendered unnecessary an answer to question No. 2.[11] The fact that the jury answered question 2 as it did indicates that it thought that alternative means of transportation were reasonably available to defendant.

The finding that Caribbean could have shipped all of Gardino's order is strongly against the weight of the evidence and is not acceptable to this Court.

### VII

The discretionary power of a trial court to grant new trials under Rule 59 is a broad one. *Sulmeyer v. Coca Cola Company,* 515 F.2d 835, 851–52 (5th Cir.), cert. den., 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341. On review, the question is limited to whether the grant constitutes a clear abuse of discretion. The power of a district court extends to the grant of a new trial on the matter of damages. *Dupuy v. Dupuy,* 551 F.2d 1005, 1024 (5th Cir.), cert. den., 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197. The discretion of the trial court includes the requirement of a remittitur by plaintiff as a condition to not granting a new trial. Appellate review in cases of remittitur is stricter. Abuse of discretion exists if the jury verdict was clearly within the ambit of possible awards supported by the evidence. *Bonura v. Sea Land Service, Inc.,* 505 F.2d 665, 670 (5th Cir.). The Fifth Circuit said in that case:

"Once it has been determined that the trial court has not abused its discretion in demanding some remittitur, then the appellate court must determine whether the amount of the award which remains after the remittitur reflects the maximum award which the evidence will support or whether it merely represents the trial court's opinion of what the proper award should have been. At this point deference will be given to the trial court's determination since he, and not the appellate court, was present during the ebb and flow of the trial, and it will be presumed that the amount which he has chosen is the amount which will reduce the jury's verdict to the 'maximum possible' award unless the party opposed to the remittitur can point to credible evidence which would support a greater recovery."

Acceptance of the remittitur by plaintiff precludes appeal even where the court's order states that the amount paid is without prejudice to the right of appeal. *Donovan v. Penn Shipping Co., Inc.,* 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112; *Krahn v. B. F. Goodrich Company,* 559 F.2d 308 (5th Cir.).

Ordinarily, this Court does not and should not disturb jury verdicts where there is supportive evidence. See *Spurlin v. General Motors Corporation,* 528 F.2d 612 (5th Cir.). The trial judge's function is not to decide what he would have done had he been on the jury, and he is not free to reweigh the evidence and set the verdict, aside because he thinks another result would have been more reasonable. *Snipes*

---

11. The question of transshipment is troublesome. The first Gardino order was transshipped through Barcelona although such practice was "not very usual" (T. 48). Caribbean made only one transshipment through northern Europe in 1973. It was at the specific request of the customer (T. 388–93). Gardino never asked Caribbean to transship its order (T. 393). The testimony regarding the number of board feet required to warrant a special port call is conflicting (T. 239, 470).

*v. Pure Oil Company,* 186 F.Supp. 373 (W.D., La.), aff'd, 293 F.2d 60 (5th Cir.). However, verdicts, including a finding in a special verdict, which are strongly against the weight of the evidence and repellent to the trial judge's concept of justice and reason should not be allowed to stand. It is his duty "to see that justice is done in each case." *Klein v. Auto Owners Insurance Co.,* 39 F.R.D. 24 (D.Minn.). See also, *Armstrong v. Jones,* 376 F.2d 345 (5th Cir.).

Caribbean's customers (exclusive of Gardino) ordered a total of 608,400 B.F. for delivery in 1973. Of that count 365,367 B.F. were shipped. Defendant therefore covered 60.0% of its orders intended for delivery that year. Of the orders taken by Wood Products in 1973 which reasonably could have been expected to be delivered (352,500 B.F.) it shipped 267,696 B.F. or 75.9%.[12]

These percentages bear strongly on the question of impossibility of performance and commercial impracticability. Caribbean's delivery to plaintiff represented only 7% of the total lumber shipped by it aboard three CTE vessels from January-April, 1973. During that period, Gardino was promised delivery of the remainder of its order prior to December. Between May and December, 1973, plaintiff's orders that were shipped on four vessels represented approximately 10% of the total shipped by Caribbean and Wood Products. Plaintiff's Ex. 86. Gardino's orders were filled by Caribbean less than 12%.

All of the orders received by Caribbean (except Gardino's) contemplated shipment prior to June, 1973. At that time no shipping difficulty existed (T. 446). The percentage of orders actually shipped by Caribbean is not the most appropriate measure of determining what it could and should have shipped to Gardino. In my opinion, a more accurate gauge is the experience of customers of Wood Products who expected delivery between May and December. So viewed, the record supports a finding that Caribbean could and should have shipped Gardino 75.9% of its order.

Using that percentage, we arrive at the following results as to plaintiff's damages.

A

"Benefit of Bargain Loss"

(1)

| Amount ordered (MBF) | | times % | = | Total that should have been shipped (MBF) |
|---|---|---|---|---|
| 2" | 400.0 | 75.9 | = | 303.600 |
| 2½" | 50.0 | 75.9 | = | 37.950 |
| 3" | 75.0 | 75.9 | = | 56.925 |

(2)

| Total that should have been shipped | | Less | Amount Shipped | = | Unshipped (MBF) |
|---|---|---|---|---|---|
| 2" | 303.600 | – | 29.200 | = | 274.400 |
| 2½" | 37.950 | – | 33.100 | = | 4.850 |
| 3" | 56.925 | – | 0.00 | = | 56.925 |

12. These figures are derived from plaintiff's exhibits 71 and 85 and defendant's exhibit 32. The figure 352,500 B.F. is the difference between the total of Wood Products' orders of 477,500 B.F. and 125,000 B.F. deemed by the Court to have been intended for 1974 delivery. Order Nos. 147, 148, 150 and 151 are specified for 1974 delivery. Nos. 144 (Grigan Timber) and 149, placed in November, 1973 for delivery "soonest," are considered to be for 1974 delivery (T. 367–8). Order number 131 by S. Gambino called for 15,000 B.F. with a notation that it could be increased to 35,000 B.F. Mr. Davis added a handwritten notation reading "Advised SPS telex 10/12 to increase if possible. JMD." On cross-examination, he explained that his notation meant that "If they had space and they had the lumber well, they could increase it." T. 373. The order is treated as one for 15,000 B.F. Plaintiff's Ex. 73 is not included in the calculations because the Court can find no evidence of whether the order was shipped and because it is deemed to be for 1974 delivery.

### A
### "Benefit of Bargain Loss"

(3)

| Unshipped | Times | Market-Price Contract-Price Differential | = | "Benefit of Bargain Loss" |
|---|---|---|---|---|
| 2″ | 274.400 | $ 218.34 | = | $ 59,912.50 |
| 2½″ | 4.850 | $ 256.34 | = | 1,243.25 |
| 3″ | 56.925 | $ 246.34 | = | $ 14,022.90 |
| Total "Benefit of Bargain Loss" | | | | $ 75,178.65 |

### B
### Lost Profits

| Unshipped | Times | Resale Price | = | Lost Sales |
|---|---|---|---|---|
| 2″ | 274.400 | $ 500 | = | $ 137,200.00 |
| 2½″ | 4.850 | $ 548 | = | 2,657.80 |
| 3″ | 56.925 | $ 538 | = | 30,625.65 |
| Total | | | | $ 170,483.45 |
| Times average Gardino profit | | | | .20 |
| Total Lost Profits | | | | $ 34,096.69 |

### C
### Maximum Recoverable Loss

| | |
|---|---|
| "Benefit of Bargain Loss" | $ 75,178.65 |
| Lost Profits | 34,096.69 |
| Maximum recoverable loss | $109,275.34 |

### D
### Difference

| | |
|---|---|
| Jury Award | $ 150,765.00 |
| Maximum recoverable loss | 109,275.34 |
| Difference | $ 41,489.66 |

### E
### Plaintiff's Recovery

| | |
|---|---|
| Maximum recoverable loss | $ 109,275.34 |
| Loss of good will | 3,676.00 |
| Attorney's fees | 24,000.00 |
| Total recovery | $ 136,951.34 |

---

## ORDER

Defendant's motion for judgment notwithstanding the verdict is denied.

Defendant's motion for new trial is denied upon all grounds except in respect to the remittitur of plaintiff's recovery of "Lost Profits" in the amount of $41,489.66. Such reduction is ordered by this Court as a condition to the denial of a new trial.

Plaintiff's election or rejection of the remittitur shall be filed within twenty (20) days from the date of this Order.